Daniel W. BROWN

v.

THOMAS O'CONNOR & CO., INC.

and

Travelers Insurance Co.

Supreme Judicial Court of Maine.

Argued April 2, 1996.

Decided Sept. 18, 1996.

James J. MacAdam (orally), McTeague, Higbee, Libner, MacAdam, Case & Watson, Topsham, for Employee.

Alison A. Denham (orally), Douglas, Whiting, Denham & Rogers, Portland, for Employer.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

LIPEZ, Justice.

Thomas O'Connor & Co., Inc. appeals from a decision of the Workers' Compensation Board denying its petition to reduce the determination of the average weekly wage of Daniel W. Brown. O'Connor contends that it was error for the Board to calculate the average weekly wage by dividing Brown's total earnings from O'Connor by the number of weeks Brown worked for O'Connor, when Brown had worked for other employers during the year. 39 M.R.S.A. § 2(2)(B), *repealed and replaced by* P.L.1991, ch. 885, §§ A–7, A–8 (effective January 1, 1993), *codified as* 39–A M.R.S.A. § 102(4)(B) (Supp. 1995). O'Connor also appeals from a decision of the Board granting its petition for review and ruling that, because O'Connor failed to present labor market evidence showing the availability of work, Brown's post-injury work, consisting of six hours per week at five dollars an hour, was prima facie evidence of his earning capacity. 39 M.R.S.A. § 55–B (1989).[1] *Fecteau v. Rich*

---

1. Former section 55–B was amended by P.L. 1991, ch. 615, § D–7. Because that amendment is only effective for injuries occurring after October 17, 1991, it does not apply to Brown's 1988 date of injury. P.L.1991, ch. 615, § D–26. Title 39 has been repealed and replaced by title 39–A.

*Vale Constr., Inc.,* 349 A.2d 162, 166 (Me. 1975). We affirm the decision of the Board.

Brown suffered a compensable injury on November 5, 1988 while employed by O'Connor, and O'Connor accepted responsibility for the injury by memorandum of payment. Prior to his injury, Brown worked for several employers for a total of about forty weeks during the calendar year of 1988. Brown worked thirteen weeks for O'Connor during three separate intervals, earning a total of $1,172.63 with an additional $132 a week in fringe benefits. Subsequent to his injury, Brown obtained a part-time cleaning job for six hours a week at a pay rate of five dollars an hour.

In December 1992 O'Connor filed petitions for review of Brown's incapacity and to reduce the determination of his average weekly wage. The Board initially granted the petition to redetermine Brown's average weekly wage, calculating an average weekly wage of $461.88 by dividing Brown's total earnings in 1988, including fringe benefits, by the forty weeks that Brown was employed that year by all employers.[2] The Board also concluded that although O'Connor met its burden on its petition for review to show that Brown had regained a work-capacity, it failed to meet its ultimate burden to show that higher paying work was available to Brown. The Board concluded that "although Brown's work search was weak," he met his burden of production to show the unavailability of work within his restrictions. The hearing officer also concluded, however, that Brown's "present six hour a week position does not establish his actual earning capacity under [*Fecteau,* 349 A.2d at 166]" and that Brown was capable of working forty hours per week at six dollars per hour ($240 per week). Based on an average weekly wage of $461.88, the Board concluded that Brown had a forty-eight percent partial incapacity.

In response to Brown's motion for findings of fact and conclusions of law, however, the Board denied the employer's petition to determine the average weekly wage. Stating that the "parties agree that the employee's average weekly wage is to be determined under [39 M.R.S.A. § 2(2)(B) ]," the Board concluded that Brown's average weekly wage, including fringe benefits, was $711.77. This latter wage was derived by considering only Brown's earnings from O'Connor, exclusive of the first week of employment. The Board also revised its determination of Brown's work incapacity from forty-eight percent to ninety-six percent. Citing our decision in *Flanigan v. Ames Dep't Store,* 652 A.2d 83, 86 (Me.1995), the Board concluded that Brown's six-hour per week post-injury employment was prima facie evidence of his work capacity and that the employer failed to meet its burden to rebut this prima facie evidence with competent evidence to show that work at higher wages was available to Brown within his restrictions. We granted O'Connor's petition for appellate review pursuant to 39-A M.R.S.A. § 322 (Supp. 1995).

### I.

■ Calculation of an employee's "average weekly wage" under former title 39 is governed by four alternative methods outlined in sections 2(2)(A), (B), (B–1) & (C) (1989). In this case, the parties agreed that because Brown had been employed for less than 200 full working days prior to his injury, section 2(2)(B) should be applied to determine his weekly wage. Subsection 2(2)(B) provides:

B. In case such employment or occupation had not so continued for said 200 full working days, the "average weekly wages, earnings or salary" shall be determined by dividing the entire amount of wages or salary earned therein by the injured em-

---

1. *Maine Workers' Compensation Act of 1992,* P.L. 1991, ch. 885, §§ A–7, A–8 (effective January 1, 1993). Because the proceedings were pending on the effective date of title 39–A, the issues in this appeal are governed exclusively by former title 39 and do not implicate the new Act. *Riley v. Bath Iron Works Corp.,* 639 A.2d 626, 627–29 (Me.1994).

2. 39 M.R.S.A. § 2(2)(B) requires the Board to consider the employee's earnings in the "immediately preceding year." 39 M.R.S.A. § 2(2)(B) (1989). After concluding that there "was no way to establish what if any earnings [Brown] had between November 5, 1987 and December 31, 1987," the Board relied on Brown's earnings for the 1988 calendar year, and not his earnings for the 52 weeks immediately preceding the injury.

ployee during said immediately preceding year, by the total number of weeks, any part of which the employee worked, during the same period. The week in which employment began, if it began during the year immediately preceding the injury, and the week in which the injury occurred, together with the amounts earned in said weeks, shall not be considered in computations under this paragraph if their inclusion would reduce said "average weekly wages, earnings or salary."

39 M.R.S.A. § 2(2)(B) (1989). O'Connor contends that it was error for the Board to consider only those weeks that Brown was employed by O'Connor, and to have excluded Brown's earnings and weeks of employment with other employers. O'Connor further contends that pursuant to the plain language of subsection B, the Board must consider all earnings and weeks of employment for the immediately preceding year that the employee "worked," including employment with other employers in the same "occupation."

As Brown contends, we rejected a similar argument in *St. Pierre v. St. Regis Paper Co.*, 386 A.2d 714, 717–18 (Me.1978). In that case, the employee had been employed for six weeks with his employer at the time of the injury and for twenty weeks with another employer in the immediately preceding year. *Id.* at 716. We stated that:

The words "such employment or occupation" appearing at the outset of paragraph B, tied as they are to the noncontinuation of "such employment or occupation" "for said 200 full working days," must have reference back to employment or occupation under paragraph A "on the part of the employer" at the time of the injury. . . . The patent intent of the statute was to make method A—the average of the employee's actual wages for at least 200 working days in the prior year—the preferred method if the particular facts permitted; and the statute placed method B—the average of the employee's actual wages for a shorter period than 200 days—second in the order of preference, if the shorter period's figures were the best actual figures available. Thus, if method B were applied [the employee's] "average weekly wages"

would be the average of his six weeks' earnings with [his employer at the time of the injury], dropping out of the average the first and the last weeks if their inclusion would reduce the wage.

*Id.* at 717–18. O'Connor contends that our construction of subsection B in *St. Pierre* was erroneous and further, because we concluded that subsection B could not be fairly applied in that case and that subsection C was the applicable provision, our analysis of subsection B was dictum.

Our construction of subsection B in *St. Pierre* was correct. The use of the word "such" in the opening phrase of subparagraph B to modify the phrase "employment or occupation" is a direct reference to subsection A, and subsection B must be read in conjunction with the immediately preceding subparagraph. *See Parker v. Bath Iron Works Corp.*, 644 A.2d 1037, 1039 (Me.1994) ("In addition to examining the plain language, we also consider 'the whole statutory scheme of which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved'") (quoting *Davis v. Scott Paper Co.*, 507 A.2d 581, 583 (Me.1986)). Subsection A provides, in pertinent part:

"[A]verage weekly wages, earnings or salary" of an injured employee shall be taken as the amount which he was receiving at the time of the injury for the hours and days constituting a regular full working week in the *employment or occupation* in which he was engaged when injured . . . provided such *employment or occupation* had continued *on the part of the employer* for at least 200 full working days during the year immediately preceding that injury. . . .

39 M.R.S.A. § 2(2)(A) (1989) (emphasis added). Subsection A plainly states that the relevant employment is the "employment or occupation" "*on the part of the employer.*" 39 M.R.S.A. § 2(2)(A) (emphasis added). If we were to construe the word "occupation" in subparagraph B to encompass employments other than the employment "on the part of the employer" at the time of injury, we would be required to reach the same conclusion pursuant to subparagraph A, contrary to its

plain meaning. Our construction is also supported by the legislative history of section 2(2). As we stated in *St. Pierre:*

> The workmen's compensation law as originally enacted in 1915, in the comparable paragraph (2) under the definition of "average weekly wages, earnings or salary," provided an averaging of the employee's wages "in the same employment in which he was working at the time of the accident, *whether for the same employer or not.*" (Emphasis added) 1915 Laws, ch. 295, § 1(IX)(A). When the legislature changed the language of that paragraph to substantially that of our present workmen's compensation law, R.S.1930, ch. 55, § 2(IX)(a), using the language "provided such employment or occupation has continued on the part of the employer," *etc.*, it plainly intended to restrict the employee's wages which were to be averaged under that paragraph to those received from the single employer at the time of the injury.

386 A.2d at 717, n. 2. *See also Valliere v. William Underwood Co.*, 537 A.2d 1161, 1162–63 (Me.1988) (Commission did not err in considering only earnings at most recent employment and ignoring earnings in a job that ended a month prior to the injury).

■ We note, as we did in *St. Pierre*, that "the statute does not stop with methods A and B. A third method is described in paragraph C for the special circumstances where either of the other methods 'cannot reasonably and fairly be applied.'"[3] 386 A.2d at 718. Although O'Connor argues that subsection C may have provided the best method to calculate the average weekly wage in this case, this approach was foreclosed by O'Con-

nor's agreement with the application of subsection B and its failure to present evidence before the Board to aid in the subsection C analysis.[4] Accordingly, we affirm the decision of the Board denying the employer's petition to reduce its determination of Brown's average weekly wage.

## II.

■ O'Connor also contends that Brown's post-injury earnings were insubstantial as a matter of law and therefore it was error for the Board to conclude in its supplemental findings of fact and conclusions of law that Brown's post-injury earnings were prima facie evidence of his earning capacity. We do not reach this contention because of the Board's alternative finding that Brown met his burden to show that higher paying work was unavailable to him as a result of his injury.

In its initial decree, the Board concluded that Brown met his burden to show that work was unavailable to him as a result of his injury. The Board's supplemental findings of fact and conclusions of law state that "[a]ll findings of fact and conclusions of law contained in the original decree in this case are incorporated herein by reference except insofar as they may be specifically contradicted below." Because nothing in the subsequent findings of fact "specifically contradicts" the finding that Brown met his burden of production to show the unavailability of work within his restrictions, that original finding is controlling. Even if we were to accept O'Connor's argument that Brown's post-injury earnings were not prima facie evidence of his

---

3. Subsection C provides:
   C. In cases where the foregoing methods of arriving at the "average weekly wages, earnings or salary" of the injured employee cannot reasonably and fairly be applied, said "average weekly wages" shall be taken at such sum as, having regard to the previous wages, earnings or salary of the injured employee and of other employees of the same or most similar class, working in the same or most similar employment in the same or a neighboring locality, shall reasonably represent the weekly earning capacity of the injured employee at the time of the injury in the employment in which he was working at such time.
   39 M.R.S.A. § 2(2)(C) (1989).

4. O'Connor contends that it did not "stipulate" to the use of method B to calculate Brown's average weekly wage. O'Connor concedes, however, that it "urged the use of § 2(2)(B)" "in its written closing argument" "... under the assumption that the Board would be considering all the employee's earnings during the 52 weeks prior to his injury." O'Connor's "assumption" that the Board would consider wages from employers other than O'Connor was based on an incorrect interpretation of former section 2(2)(B). Having failed to argue in favor of the application of subsection C before the Board, O'Connor may not now argue on appeal that it was error for the Board to apply subsection B.

earning capacity, Brown met any additional burden of production necessary to show the unavailability of higher paying work and the Board reasonably rejected O'Connor's labor market evidence purporting to show that work was available. Therefore, the Board calculated Brown's earning incapacity correctly based on the actual difference in his pre-injury and post-injury earnings.

The entry is:

Decision of the Workers' Compensation Board affirmed.

All concurring.